UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARQUIS PARKER,

                                Petitioner,                          DECISION AND ORDER

                                                                            18-CV-6106L

                v.

SUPERINTENDENT HAROLD D. GRAHAM,

                                                Respondent.
_____

            Petitioner, Marquis Parker ("Petitioner"), has filed a *pro se* petition for a writ of habeas

corpus, pursuant to 28 U.S.C. § 2254.  Petitioner was convicted after trial of shooting and injuring

two police officers who responded to a home invasion robbery in Rochester, New York.  Parker is

currently serving an aggregate 50 year sentence, with five years of post-release supervision,

following his conviction of two counts of assault in the first degree, assault in the second degree,

attempted robbery in the first degree, burglary in the first degree, and criminal possession of a

weapon in the second degree.

            The petition for writ of habeas corpus is in all respects denied.

## BACKGROUND

### I.      Factual Background

            On December 1, 2009, Jaqueline Anderson ("Anderson") received a call from Nixon Elian

("Elian"), a man she knew, who advised her that he was coming to her apartment to repay a loan.

(Trial Tr. at 457-58).  At approximately 11:14 p.m., Elian arrived at Anderson's apartment.  (*Id.*

at 459-60).  As Elian entered, Anderson attempted to close the door, but "a foot stopped the door,"

and a second man forced his way into her apartment.  (*Id.* at 460-61).  She testified that this second man was wearing a dark hoodie, closed around his face, with a "little bit" of hair "sticking out of the hood," and that he was wearing gloves.  (*Id.* at 462-63, 470).

According to Anderson, upon entry, Elian pointed a handgun at her face and announced a robbery.  (*Id.* at 462, 464).  At first, Anderson told the men that she had no money.  (*Id.* at 466).  Then, in an effort to get at least one of the men to leave, she told the men that she had money in her car, parked on the street just below her apartment window.  (*Id.* at 467).  Anderson testified that Petitioner then took her car keys and left the apartment.  (*Id.* at 468-69).  It was approximately 11:22 p.m.  (*Id.* at 320).

After Petitioner left the apartment, Anderson testified that Elian pinned her on the floor, choked her, and asked what would happen if he let her live.  (*Id.* at 469).  She pretended to be unconscious, but Elian slapped her to wake her up, and asked how Petitioner was to reenter the building.  (*Id.* at 470-71).  When Petitioner returned, Anderson testified that Petitioner "pistol whipped" her—sharing the same gun with Elian—and threw her on the couch.  (*Id.* at 471-72).

Meanwhile, the building superintendent, Paul Berger ("Berger"), had seen two men enter the building on the video surveillance system—one man in a light hooded sweatshirt and one man in a dark hooded sweatshirt.  (*Id.* at 311).  He testified that something about the men "just didn't seem right"—the men appeared to look away from the camera and their hoodies were closed around their faces.  (*Id.* at 315-16).  Berger then walked up to Anderson's apartment and heard what seemed to be screaming.  (*Id.* at 316-17).  He returned to his apartment and called the police. (*Id.* at 318).

While waiting for the police, Berger observed one of the men, who was in a dark hoodie, exit the apartment, walk downstairs, exit the front door, and walk to the left.  (*Id.* at 321, 322).

The man ran around the building and entered Anderson's car.  (*Id.* at 323).  He then tried to re-enter the apartment building with a key.  (*Id.* at 324).  Berger, who was outside at the time, told the man that the keys would not open the building.  Rather, as Berger testified, an individual would need an access code or to ring a buzzer in order to gain access to the building.  (*Id.* at 324-25).  The man walked away but returned and was buzzed back into the building.  (*Id.* at 325).

At 11:32 p.m., Rochester Police Officers Daniel Brochu and Luca Martini arrived at the apartment building where they were met by Berger.  (*Id.* at 326).  Berger explained what he had observed and took the Officers to Anderson's apartment.  (*Id.*).  When Officer Martini knocked on the apartment door, Officers Martini and Brochu could faintly hear a conversation inside the apartment.  (*Id.* at 410).  Officer Brochu stood to the left of the doorway and Officer Martini to the right.  (*Id.* at 409).

Inside the apartment, Elian asked Anderson if she was expecting anyone.  Elian then instructed her to ask who was at the door and she complied.  (*Id.* at 473-74).  Office Martini announced it was the police.  According to Anderson, Elian then put the gun to her head and "escorted" her to the door, telling her to "act calm and get rid of [the police]."  (*Id.* at 474).  Anderson testified that during this time, the other man was "close" to her.  (*Id.*).

Anderson opened the door a crack, but then quickly threw the door open, ran past the Officers and yelled: "'Get 'em.'"  (*Id.* at 412-13).  Immediately, Officer Martini was "confronted with a revolver in [his] face."  (*Id.* at 439).  He testified that he swatted the gun away with his left hand, heard a gunshot, and immediately felt pain in his left hand.  (*Id.* at 440).  He spun around and ran for cover.  (*Id.*).  As he turned, he felt pain in his right arm.  (*Id.* at 441).  Officer Martini then went into a vacant apartment behind him.  (*Id.*).  Likewise, Officer Brochu testified that as Anderson ran out of the apartment, he heard a gunshot and saw Officer Martini swat his left hand.

3

(*Id.* at 413-14).  He drew his gun and ran to take cover.  (*Id.* at 414-15).  As he ran, he heard two more shots, then he heard a fourth shot and felt severe pain in his right leg.  (*Id.* at 416).  Both officers would later testify at trial that they both had received gunshot wounds during the encounter.

Soon thereafter, the surveillance video showed the intruder (identified as Elian, the man in the light hoodie) come out of the apartment, run down the stairs, out the front entrance, and across the street.  (*Id.* at 328).  The officers did not see anyone else come out of the apartment.

Inside Anderson's apartment, one of the windows leading to the fire escape was broken from the inside out and there was glass on the fire escape.  (*Id.* at 255).  The surveillance video shows that by 11:36 p.m., the fire-escape stairs were down, an individual had gone down the stairs and headed south.  (*Id.* at 333-34).  Police also found a black hooded sweatshirt inside the apartment, which Anderson identified as the sweatshirt Petitioner was wearing.  (*See id.* at 251-52).

## II.    Trial

During trial, Anderson formally identified Petitioner as the second man who entered her apartment the night of December 1, 2009.  (*Id.* at 477).  During cross-examination, she testified that she learned the Petitioner's name through the "media" and from seeing photos at the District Attorney's Office.  (*Id.* at 497).  After eliciting this testimony, Petitioner's counsel objected that an identification procedure had not been included in the prosecution's CPL § 710.30 notice.  (*Id.*).  The court directed counsel to continue with the cross-examination.  (*Id.* at 498).

Through further cross-examination it was discovered that Anderson had been shown Petitioner's photograph by then-Assistant District Attorney Sandra Doorley.  (*Id.* at 498).  She also testified that she had seen a photograph of Petitioner on television "at least ten" times and that she assumed it was Petitioner's "mug shot."  (*Id.* at 499).

4

The trial court excused the jury and Petitioner's counsel moved for a mistrial on the basis that Anderson's in-court identification of Petitioner had been tainted and that the People had violated the notice provision of CPL § 710.30.  (*See id.* at 500).  After a hearing on the issue, the court denied the mistrial motion finding that there was no "identification" procedure involving Anderson under CPL § 710.30.  As such, no notice was required.  (*See id.* at 560-61).

When cross-examination of Anderson resumed, she acknowledged that immediately following the robbery she could not identify the second intruder.  (*Id.* at 589-90).  She testified that she later saw his photograph "laying around the desk" during one of her meetings with the prosecutors.  (*Id.* at 590-91).  However, she also testified that "what really made [her] know that [the second intruder] was [Petitioner] was the still shot" from the surveillance video that was shown to her just before she began testifying at trial.  (*Id.* at 590).

The prosecution also presented DNA evidence at trial linking Petitioner to the crime scene. Specifically, DNA from a saliva stain found on the dark hooded sweatshirt recovered from the apartment was compared to a DNA sample Petitioner provided to the police.  The results showed that Petitioner's DNA was the "major contributor" to the stain.  (*Id.* at 871-72).  Testimony also showed that, "[t]he probability of randomly selecting an unrelated individual having the same DNA profile as the major component of [the sweatshirt] and [Petitioner] is less than one and 4.73 sextillion."  (*Id.* at 874).

Finally, the prosecution provided evidence of the shots fired at the crime scene.  A officer arriving at the scene shortly after the shooting, chased Elian and saw him toss a firearm in a yard between two nearby houses.  The testimony of the wounded officers showed that the first three shots hit Officer Martini—the first bullet passed through his hand, the second and third were to his

upper right arm and his chest where they were recovered during surgery.  (*See* Trial Tr. at 440-48).
The fourth and final bullet hit Officer Brochu's right leg as he ran for cover.  (*See* 416-17).

At the conclusion of trial, the jury convicted Petitioner of two counts of assault in the first
degree, attempted robbery in the first degree, burglary in the first degree, criminal possession of a
weapon in the second degree, and assault in the second degree.  The jury acquitted Petitioner of
criminal possession of stolen property in the fourth degree and attempted rape in the first degree.
On March 3, 2011, the trial court sentenced Petitioner to 20 years imprisonment for each of the
first degree assault convictions on the offenses, 10 years for the attempted robbery, 20 years for
the burglary, 10 years for weapon-possession, and 7 years for second degree assault.  (Mar. 3, 2011
Hr'g Tr. at 34-35).  The first-degree assault sentences were to run consecutively to each other and
to the remaining counts which would run concurrently.  (*Id.*).  The 60-year sentence was reduced
to 50 years under Penal Law § 70.30(1)(e)(vi) and the trial court imposed five years of post-release
supervision.  (*Id.* at 35, SR 341).

### III.   Post-Trial

#### A.   Direct Appeal

On March 16, 2015, Petitioner, through counsel, filed an appeal to the Appellate Division,
Fourth Department, asserting *inter alia*, that: (1) trial counsel was ineffective for various reasons,
including for failing to move to suppress an "involuntarily obtained DNA sample" and for
conceding in opening statement that Petitioner was the second man involved in the crime but
arguing the opposite in closing statement; (2) the People violated CPL § 710.30 by failing to give
notice that the prosecution had shown Anderson a portion of the surveillance video prior to her
in-court identification; and (3) the sentence was unduly harsh.  (*See* SR 279-80).  In addition,
Petitioner filed a *pro se* supplemental brief asserting that his sentence was illegal because the

assault sentences stemmed from one incident, rather than two separate acts, and therefore, the sentences should run concurrently.  (*See* SR 394-401).

On November 20, 2015, the Appellate Division unanimously affirmed the conviction. *People v. Parker*, 20 N.Y.S.3d 781 (App. Div. 2015).  The court found that trial counsel was effective, despite not seeking to suppress the DNA evidence, because the interrogation recording demonstrated that Petitioner voluntarily agreed to provide the DNA sample to police.  *Parker*, 20 N.Y.S.3d at 782.  The Appellate Division found in part that trial counsel did not provide ineffective assistance of counsel merely because he failed to file a motion that had little or no chance of success.  The court found that all other grounds raised by Petitioner regarding the ineffective assistance of counsel were without merit and that overall, he was "afforded meaningful representation."  *Id.* at 782-83.

In regard to Petitioner's allegation that the People failed to comply with the notice requirements of CPL § 710.30, the appellate court found that the image shown to Anderson, taken from a surveillance video, was not a police-arranged identification procedure within the definition of section 710.30, and therefore, there was no notice violation.  *Id.* at 783.  Likewise, the appellate court found Petitioner's illegal sentence claim lacked merit.  *Id.*

Petitioner then filed an application for leave to appeal the decision to the New York Court of Appeals, which was unanimously denied on July 7, 2016.  *People v. Parker*, 62 N.E.3d 128 (N.Y. 2016).  Petitioner filed a *pro se* motion for reconsideration which was also denied by the Court of Appeals on October 27, 2016.  *People v. Parker*, 68 N.E.3d 110 (N.Y. 2016).

**B.  Coram Nobias Motion**

On January 8, 2018, Petitioner filed a *pro se coram nobis* motion with the Appellate Division asserting a claim for ineffective assistance of appellate counsel on the basis that appellate

counsel did not assert that trial counsel was ineffective for failing to: (1) move for a pretrial line-up for the identification of Petitioner; (2) object to Anderson's in-court identification of Petitioner; and (3) move to suppress Anderson's in-court identification of Petitioner.  (SR 518-19).  The Appellate Division summarily denied the motion.  (SR 705).

Petitioner filed a *pro se* application for leave to appeal the decision to the New York Court of Appeals on July 7, 2018.  (*See* SR 707-45).  On September 17, 2018, the Court of Appeals denied the application.  (SR 746).

**C.  Habeas Petition**

On February 1, 2018, Petitioner filed his initial Petition for Writ of Habeas Corpus raising two grounds for relief, including that: (1) he was denied effective assistance of counsel at trial and (2) the consecutive sentences on the two assault convictions was illegal.  (Dkt. # 1 at 5-7).  Petitioner also requested that the Court enter a stay-and-abeyance order until the Petitioner's writ of error *coram nobis* was resolved.  (*Id.* at 15).  On February 19, 2018 this Court denied, without prejudice, Petitioner's request for a stay-and-abeyance because the Petition did not contain both exhausted and unexhausted claims.  The Court provided Petitioner until March 16, 2018, to file an amended petition setting forth all claims and a renewed request for a stay-and-abeyance.  (Dkt. # 3 at 1-3).

On March 14, 2018, Petitioner filed an Amended Petition for Writ of Habeas Corpus (the "Amended Petition"), raising three grounds for relief, including that: (1) he was denied effective assistance of counsel at trial; (2) he was denied effective assistance of appellate counsel; and (3) the consecutive sentences on the two assault convictions was illegal.  (Dkt. # 4 at 5-8).  The Amended Petition also requested a stay-and-abeyance until Petitioner's application for a writ of error *coram nobis* was "final."  (*Id.* at 15).  This Court granted the request.  (Dkt. # 8).

8

After Petitioner exhausted his additional claims in the state court system, he moved this Court to lift the stay on the Amended Petition.  (Dkt. # 10).  The motion was granted. (Dkt. # 11).  The claims presented in the Amended Petition are now ripe for disposition.

## DISCUSSION

## I.    Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has been adjudicated on the merits in state court, federal habeas corpus relief is available only if the state court proceeding: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Where, as here, a state court rejects a petitioner's habeas claim on the merits, "the federal court must 'focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent.'"  *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001)) (additional citations omitted); *see also Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  "A state court decision slips into the 'unreasonable application' zone 'if the state court identifies the correct governing legal principle from [the Supreme Court's] decision but unreasonably applies that principle to the facts of the prisoner's case.'"  *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (modification in original).  "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous*

application of federal law." *Williams*, 529 U.S. at 412 (emphasis in original). Thus, it is not enough that this Court may have decided the question of law differently, rather, to deem habeas relief appropriate, the state court's application must demonstrate some additional "increment of incorrectness beyond error." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

## II.   Analysis

### A.  Whether Parker Was Denied Effective Assistance Of Counsel (Ground One)

Petitioner claims that he was denied effective assistance of trial counsel for multiple reasons. (Dkt. # 4 at 5). The first ground is  for trial counsel's failure to move to suppress the DNA sample which was allegedly provided involuntarily to police; the second is for trial counsel's inconsistent trial strategies and arguments; and third, for trial counsel's failure to understand the nature of the felony assault statute. Finally, Petitioner also lists various other errors demonstrating an overall lack of preparedness for trial. These claims include trial counsel's performance in cross examinations and voir dire.[1]  (*Id.*).

On direct appeal, the state appellate division rejected these claims, holding that the recording of the Petitioner's interrogation established that Petitioner voluntarily agreed to provide the DNA sample to police and counsel was therefore not ineffective for failing to move to suppress such evidence, and that the remaining contentions regarding ineffective assistance of counsel "lack[ed] merit." *Parker*, 20 N.Y.S.3d at 782. Respondent argues here that each of Petitioner's claims of ineffective assistance lack merit. (*See* Dkt. # 23 at 23-55). The Court agrees.

---

[1] Petitioner also contends that his trial counsel was ineffective for failing to object to the testimony of Berger regarding the surveillance video from the apartment complex. However, in his reply brief Petitioner concedes that there was no issue with Berger's testimony regarding the interior and exterior of the apartment building and the various viewpoints of cameras, given his role as building superintendent. (Dkt # 39 at 31). As such, the Court will not address the merits of that claim.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). This two-part *Strickland* test imposes a heavy burden on one claiming ineffective assistance of counsel. Both prongs must be sufficiently established to warrant relief. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). As such, "decisions which fall squarely within the ambit of trial strategy . . . if reasonably made, will not constitute a basis for an ineffective assistance claim." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).

### i.   Counsel was Not Ineffective for Failing to Move to Suppress DNA Evidence

Petitioner argues that his trial counsel should have moved to suppress the DNA evidence obtained from the buccal swab. The Appellate Division concluded, based on the interrogation video, that Petitioner "voluntarily agreed to provide the DNA sample." *Parker*, 20 N.Y.S.3d at 782. As mentioned, the Appellate Division noted that trial counsel is not deemed to have provided ineffective assistance for failing to file a motion with little chance of success. The state court's decision was reasonable and should not be disturbed.

It is well established that, "[w]here an ineffective assistance of counsel claim is premised on counsel's failure to make a suppression motion, a showing of prejudice under *Strickland* requires that the underlying suppression claim was 'meritorious' and that 'there is a reasonable probability that the verdict would have been different absent the excludable evidence.'" *Parisi v. Artus*, No. 08-CV-1785 (ENV), 2010 WL 4961746, at *6 (E.D.N.Y. Dec. 1, 2010) (quoting

11

*Maldonado v. Burge*, 697 F. Supp. 2d 516, 525 (S.D.N.Y. 2010)) (additional citations omitted). To determine whether a suppression motion would have been meritorious, courts must determine whether the evidence—here, the DNA—was retrieved voluntarily.  To do so courts look at the totality of the circumstances to ensure the search is free of any coercion.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  Factors to be considered include the suspect's age, level of education, advice of suspect's constitutional rights, length of detention, nature of interrogation and deprivation of food or sleep.  *See People v. Rodriguez*, No. 3313-2018, 2020 WL 5667288, at *20-21 (Sup. Ct. N.Y. Cnty. Sept. 24, 2020); *see also People v. Dail*, 894 N.Y.S.2d 78, 79-80 (App. Div. 2010) (determining whether defendant's consent to providing a DNA sample was voluntary by taking into consideration length of time in custody, number of officers present, familiarity with the criminal justice system, and knowledge of rights); *People v. K.N.*, 87 N.Y.S.3d 862, 868 (Crim. Ct. N.Y.C. 2018) (listing the factors considered in determining whether a defendant's DNA was collected with consent).

Here, the evidence shows that Petitioner's interrogation began around 8:14 p.m. at the Public Safety Building, after being picked up by Officer Stuart, who recognized Petitioner based on a description provided by prior surveillance.  (*See* Mar. 26, 2010 Hr'g Tr. at 12, 36).  Petitioner was interrogated by Investigator Cassidy and Investigator Donovan, who first learned from Petitioner that he had a GED and had attended some college courses.  (*Id.* at 39).  Around 8:19 p.m. Petitioner was read his Miranda Rights.  (*Id.* at 41).  After Petitioner's rights were read and acknowledged, Petitioner and the Officers spoke for approximately an hour and a half about the crime at issue.  (*Id.* at 42).  Initially, Petitioner denied being present at the scene but later admitted his involvement in the crime.  (*Id.* at 43).  At no point did Petitioner request an attorney.  (*Id.* at 50).

Around 10:52 p.m. Officer Cassidy returned to the interrogation room after a brief break and obtained a DNA sample from Petitioner.  (*Id.* at 48).  However, prior to providing DNA, Petitioner asked Investigator Cassidy whether DNA was taken from everyone.  Rather than informing Petitioner of his right to refuse, Investigator Cassidy said that they had to "do it on everything," advising further that they had to get fingerprints, DNA, and other evidence from Petitioner concerning the crime.  (*See* SR 296) (citing Mar. 26, 2010, Hr'g Ex. 5 at 22:52:07 to 22:53:37).

Under these circumstances, it was not an unreasonable application of precedent for the state appellate court to deem the DNA swab voluntarily collected, and therefore finding the suppression motion would have failed.  Indeed, numerous cases evaluating the totality of the circumstances, have deemed similar circumstances a voluntary collection of DNA evidence.  *See, e.g.*, *People v. Kluge*, 116 N.Y.S.3d 363, 369-70 (App. Div. 2020) (DNA evidence collected voluntarily where defendant was in custody for two and a half hours, was not told he would not be allowed to leave if he did not consent to providing DNA evidence, read and signed a consent form, and remained cooperative throughout the process); *Rodriguez*, 2020 WL 5667228 at *20-21 (DNA evidence collected with consent where defendant was cooperative, was never handcuffed, was informed of his right to refuse before signing the consent to collect DNA, and the consent forms were read to defendant before signing); *Dail*, 894 N.Y.S.2d at 79-80 (defendant's consent voluntary where defendant was in custody for less than an hour, two police officers were present in the interview room he was familiar with the criminal justice system, and had signed a form informing him of his right to refuse consent); *People v. Augustin*, No. 1354N-17, 2018 WL 2750271, at *6 (N.Y. Sup. Ct. Nassau Cnty. June 5, 2018) (DNA evidence voluntarily collected where defendant was only at the precinct for a few hours when he consented to the sample, there were only two detectives in

the room, he waived his Miranda rights and voluntarily discussed the incident.  Additionally, while the detective did not tell him the sample could connect him to the assault, the omission was not a deception "so fundamentally unfair as to deny due process.").

In any event, the matters involving the collection of the DNA sample involve interpretation of state law and raise no issue of federal statutory or constitutional law.  After reviewing all the facts, both the state trial court and the Appellate Division found no error of state law in taking the DNA sample from Petitioner.  That finding is clearly not unreasonable and, in the context of a claim involving ineffective assistance of counsel, the Appellate Division determined that failure to file such a meritless motion provided no basis for ineffective assistance of counsel relief.

### ii.  Counsel's Trial Strategies were Not Ineffective

Petitioner argues that trial counsel was ineffective for conceding in opening statement that Petitioner was present at the crime scene, but then, in summation, arguing that the People did not prove, beyond a reasonable doubt, that Petitioner was present at the crime scene.  The strategic decision of counsel under the circumstances that developed at trial was not unreasonable, but even if in hindsight a different strategy might have been employed, on the facts of this case counsel's decision is not such to constitute ineffective assistance of counsel.

"Case law recognizes that conceding facts that are damaging to a defendant does not by itself amount to ineffective assistance of counsel where there is a sound strategy behind the concession or it was done to build trust with the jury. . .." *Jackson v. U.S.*, No. 13 Civ. 3262 (PGG) (GWG), 2016 WL 6938527, at *9 (S.D.N.Y. Nov. 28, 2016) (citing *Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010) (holding that an admission to the time of the victim's death was not ineffective assistance where it established a forthright relationship with the jury) (other citations omitted)).

Here, trial counsel's initial concession to Petitioner's presence at the crime scene was reasonable given the overwhelming evidence establishing his presence, including, Petitioner's DNA, his prior involvement with Elian, and Petitioner's own admission to police, and counsel's strategic choice to focus on nullifying the jury on the basis of fairness discussed *infra* Section II.A.iii.  While the People did not ultimately present evidence of Petitioner's own admission to his involvement in the robbery, there was no reason for trial counsel to believe that such evidence might not be admitted.  In fact, Investigator Cassidy and Investigator Donovan, to whom Petitioner made the admission, were both on Petitioner's witness list.  And, as Petitioner pointed out, the People indicated to the trial court that if Petitioner's statement was going to be admitted as evidence, the People would bring copies of the transcript for the court.  (Dkt. # 39 at 27).  In light of such evidence, it was a reasonable strategy to concede Petitioner's presence at the scene and build credibility with the jury in the hopes of achieving jury nullification.  *See Bierenbaum*, 607 F.3d at 52 (while in hindsight, it seemed "extraordinary" to concede to crucial elements of the case, "it was a reasonable trial strategy to establish a forthright relationship with the jury").

This claim of ineffective assistance was raised on direct appeal, but the Appellate Division rejected it with little comment.  Trial counsel should be afforded wide leeway in determining how to challenge a case with strong direct and circumstantial evidence.

Despite this concession, trial counsel's later statement that the People did not prove Petitioner's presence beyond a reasonable doubt was likewise not unreasonable.  Notably, the evidence ultimately presented at trial did not include Petitioner's admission of involvement.  Thus, the main evidence linking Petitioner to the crime was the DNA evidence from the hooded sweatshirt and the in-court identification of Petitioner by Anderson, which counsel vigorously challenged during cross-examination of Anderson.  It was therefore a not unreasonable strategy to

provide the jury an alternative theory of the case by which they could ultimately exonerate Petitioner.  *See Kirby v. Senkowski*, 141 F. Supp. 2d 383, 403 (S.D.N.Y. 2001) (counsel was not ineffective for presenting two alternative theories of the case where both could potentially exonerate the defendant).  And while such a theory was contrary to trial counsel's initial strategy, the introduction of an alternative, albeit, conflicting theory in closing statement was not an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  Indeed, this has been upheld as a legitimate tactic by counsel.  *See, e.g.*, *Morgan v. Lee*, No. 10-CV-3954 (NGG) (RER), 2015 WL 5547796, at *7 (E.D.N.Y. Sept. 18, 2015) (pursuing inconsistent defenses is not unreasonable and cannot constitute ineffective assistance of counsel where the alternative defenses were strategically based).

### iii.  Counsel Understood the Relevant Statute

Petitioner asserts that trial counsel was ineffective on the basis that counsel did not understand the felony assault statute, New York Penal Law § 120.10(4), which provides that a conviction will result if, "in the course of and in furtherance of the commission or attempted commission of a felony, to wit, a robbery, or of immediate flight therefrom, the defendant or another participant in the felony caused serious physical injury to" the Officers.  This Court disagrees.

Petitioner's gratuitous speculation that his seasoned trial lawyer lacked understanding of a pretty straightforward statute should be given short shrift.  Petitioner obviously has no way of knowing, absent sheer speculation, what counsel knew or understood.

As Petitioner concedes, an assault conviction would result in his case so long as, "Elian, while in immediate flight from the attempted robbery[ ](underlying felony), cause[d] serious

physical injury to Officers Martini or Brochu." (Dkt # 39 at 17). However, if the jury believed that the robbery had terminated and Elian was in pursuit of a separate felony at the time the Officers were injured, an argument existed that Petitioner could not have been convicted of the later assault. *See People v. Carter*, 377 N.Y.S.2d 256, 258-59 (App. Div. 1975).

Counsel's comments relative to flight and attempt to separate acts appears a strategic attempt to defeat the requirements of the assault charges. Counsel's strategic attempts appeared to be an effort to point out that Petitioner's conduct was removed from his co-defendants and, therefore, precluded a finding by the jury of proof beyond a reasonable doubt. Again, counsel's efforts were designed to separate Petitioner's conduct from Elian's and, therefore, present a basis for a possible acquittal. The Appellate Division gave this claim little attention. Petitioner's speculation about his attorney's knowledge of the relevant New York penal law provides no basis for relief here either.

There is simply no evidence here of an unreasonable application of law by the state court in denying this claim on the merits. Therefore, the habeas petition cannot be granted on this basis.

### iv.  Counsel was Otherwise Effective

Petitioner also asserts that trial counsel was ineffective for the cross-examination of Officer Romeo, the cross examination of Anderson, and the lack of voir dire regarding the publicity of the case. This Court disagrees.

"[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are [ ] strategic in nature.'" *Ramirez v. United States*, 898 F. Supp.2d 659, 666 (S.D.N.Y. 2012) (quoting *Nersesian*, 824 F.2d at 1321). For a cross examination to be constitutionally deficient, a court must find that "'there is no strategic or tactical justification for the course take.'"

*Eze v. Senkowski*, 321 F.3d 110, 127 (2d Cir. 2003) (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998)).  There clearly were reasons to counsel's decisions.

Trial counsel's cross examination of Officer Romeo cannot be said to have no strategic justification.  Counsel was able to get the Officer to acknowledge that: (1) he had no basis to arrest Petitioner in connection with a robbery that occurred earlier the same evening as the crime here; (2) he could not describe any of Petitioner's "distinguishing features;" and (3) he had no weapon when searched.  (Trial Tr. at 730-31).  While it is true that some damaging testimony came out during the cross examination, including that Petitioner matched the description of a suspect who committed an armed robbery earlier that evening, (*id.* at 733-43), this is not enough to render the cross examination without any justification.  *See, e.g.*, *Dunham v. Travis*, 313 F.3d 724, 727, 732 (trial counsel's cross examination was not insufficient where counsel elicited testimony to damage the witness's credibility); *People v. Adams*, 872 N.Y.S.2d 616, 617 (App. Div. 2009) (eliciting damaging testimony during cross examination does not render counsel ineffective).

The same is true of trial counsel's cross examination of Anderson.  The cross-examination of Anderson was quite effective.  Challenging the testimony of this eyewitness was critical.  Counsel spent a significant amount of time effectively cross examining her and eliciting testimony which damaged her credibility.  In fact, counsel was able to get Anderson to testify to her drug use, her possession of large quantities of marijuana, drug-dealing paraphernalia, ammunition, large amount of cash, her criminal record and pending charges, her mental health, and crucially, her inability to identify Petitioner at the time of the crime.  (*See generally* Trial Tr. at 571-620).  Counsel was also able to get Anderson to testify that she did not know where Petitioner was when the shooting began and elicited testimony to demonstrate that there was insufficient evidence to support a charge of attempted rape, as evidenced by the acquittal.  (*See id.* at 598-99, 611-13, 619).

18

This cross-examination appears to have been highly effective and certainly could not be deemed ineffective assistance of counsel under the highly deferential *Strickland* standard.

Petitioner's claim that counsel was ineffective for not asking the prospective jurors about pretrial publicity also fails.  As an initial matter, when the potential jurors were read the charges against Petitioner, the Judge made clear the assault charges were due to "serious physical injury to *Rochester Police Officer* Luca Martini," and "serious physical injury to *Rochester Police Officer* Daniel Brochu."  (Trial Tr. at 16-17) (emphasis added).  The prospective jurors were each provided a list of names of potential witnesses which included the two officers who were injured on the night of the crime.  (*See, e.g.*, *id.* at 26-27).  The jurors were also asked various questions which made clear this case involved injured police officers.  (*See, e.g.*, *id.* at 44 (the People asked whether the jurors were familiar with the allegations concerning the victims "Officer Luca Martini and Officer Daniel Brochu."); *id.* at 122 (trial counsel for Petitioner asked whether police officers in the courtroom would give the prosecution "the edge" because two officers in the case were shot); *id.* at 145-46 (in response to a prospective juror indicating he knew Officer Brochu, trial counsel asked questions regarding how they met, when they met, and what regarding the case the prospective juror knew, including from family and the media)[2]; *id.* at 147 (trial counsel asked whether anyone "heard about [the] incident on TV or the newspaper.")).

Not only did Petitioner' trial counsel, the trial court, and the People ask questions to ensure the jury empaneled would be fair and impartial despite news reports of the case, but Petitioner cannot make any showing of prejudice as there is no evidence of jury bias.  Indeed, "[j]ury bias can be established only if a habeas petitioner demonstrates that 'prejudice [wa]s 'manifest.'" *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (quoting *Irvin v. Dowd*, 366 U.S. 717, 724

---

[2] This juror was excused from the case.

(1961) (collecting cases)).  "That is, the petitioner must show the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality."  *Id.* (internal citations and quotations omitted).  There is simply no allegation set forth by Petitioner, nor is there anything in the record to indicate anyone on the jury was bias against Petitioner due to pre-trial publicity.  The jury appears to have been careful and discerning since they acquitted Petitioner of two charges, Attempted Rape in the First Degree and Criminal Possession of Stolen Property.  Therefore, this Court cannot say that the state court's denial of this claim on the merits was an unreasonable application of federal law, such that habeas relief is appropriate.

### B.  Whether Parker Was Denied Effective Assistance Of Appellate Counsel (Ground Two)

Petitioner also asserts a host of claims his appellate counsel failed to raise on appeal, which Petitioner asserts rendered appellate counsel ineffective.  (Dkt. # 4 at 7).  Specifically, Petitioner argues that his appellate counsel was ineffective for failing to raise arguments relating to trial counsel's failure to: (1) request a pretrial line-up procedure, (2) object to Anderson's in-court identification, and (3) move to suppress Anderson's in-court identification of Petitioner.  (*Id.*).  Respondent argues that all the bases for this claim lack merit.  (*See* Dkt. # 23 at 56-66).  This Court agrees.

The *Strickland* standard discussed above also applies to claims for ineffective assistance of appellate counsel.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Specifically, "[a] petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful."  *Smith v. Goord*, 412 F. Supp. 2d 248, 255 (W.D.N.Y 2006).  However, where, as here, Petitioner is raising claims of ineffective assistance of appellate counsel, based on the failure

to bring claims of ineffective assistance of trial counsel, Petitioner must demonstrate that his trial would have resulted differently had the allegedly faulty conduct by trial counsel not occurred. *Richburg v. Hood*, 794 F. Supp. 75, 78 (E.D.N.Y. 1992).

### i. Counsel was Not Ineffective for Failing to Raise Trial-Counsel's Failure to Request a Pre-Trial Line-Up Procedure

Petitioner first argues that his appellate counsel was ineffective for failing to raise the argument that his trial counsel was ineffective for not requesting a pre-trial line up procedure. This Court disagrees.

The decision of whether to request a lineup prior to an in-court identification is tactical, given the inherent weakness of a strictly in-court identification. *See United States v. Matthews*, 20 F.3d 538, 547 (2d Cir. 1994). Indeed, where a witness may have had the opportunity to view the defendant in the commission of a crime, it may be preferred not to chance bolstering the in-court identification through the pretrial line-up procedure. *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.")); *see also Johnson v. United States*, No. 11-CV-4730, 2014 WL 4545845, at *7 (E.D.N.Y. Sept. 12, 2014) (recognizing the risk of bolstering the credibility of an in court identification by having the petitioner participate in a pre-trial line-up). Rather, counsel may instead make the tactical decision to avoid a line up and focus on discrediting a witness's in-court identification by pointing out the inherent suggestiveness and weakness of such an identification through cross examination. *Flowers v. Ercole*, No. 06-cv-6550, 2008 WL 2789771, at *11 (E.D.N.Y. June 23, 2008).

Here, it was not clear whether Anderson was going to attempt to identify Petitioner in trial. Additionally, it was unknown to Petitioner's counsel, until cross examination, that any sort of identification of Petitioner had been made prior to trial or that Anderson was shown any image of

Petitioner prior to trial.  (Trial Tr. at 497 (after Anderson stated that she saw photographs of Petitioner in the District Attorney's office, trial counsel approached the bench and stated, "there was never a 710.30 Notice about a photographic array with this individual," indicating his lack of knowledge that Anderson had seen photographs of Petitioner)).  Nevertheless, once Anderson identified Petitioner as the second intruder on the night of the crime, Petitioner's trial counsel was able to pull out the weakness of Anderson's identification through cross examination.  For example, trial counsel was able to make clear to the jury that Anderson was unable to determine who the second intruder was immediately after the crime, that she saw Petitioner's picture numerous times through the media when this specific case was discussed, that she saw his photo on the prosecution's desk during a meeting, and that she was shown a picture of the intruder captured by the apartment's surveillance tape from the night of the incident, prior to her identification.  (*See id.* at 497-99, 590-93).  Thus, counsel was effective in discounting the credibility of her in-court identification.

Had Petitioner participated in a pre-trial line-up for identification purposes, it is possible that Anderson would have identified Petitioner.  If this occurred, it likely would have been difficult to convince the jury, through cross examination, that Anderson's identification was not reliable.  Therefore, even assuming Petitioner's counsel knew Anderson would attempt to identify Petitioner in court, it was a strategic call to avoid chancing the bolstering of her testimony with a pre-trial line-up.  *See Johnson*, 2014 WL 4545845 at *7 (recognizing that having defendant "participate in a line-up, or removed from counsel table, would have risked bolstering" the witness's identification).

It therefore cannot be said that trial counsel acted in an objectively unreasonable manner in failing to request a pre-trial line-up procedure.  Because Petitioner cannot demonstrate that trial

counsel was ineffective for failing to request a pre-trial line-up procedure, Petitioner cannot demonstrate that appellate counsel's failure to raise the claim on appeal fell below the "objective standard of reasonableness."  Nor can he demonstrate that had the claim been raised, there was a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 688, 694.  Indeed, the pretrial line-up would have either bolstered Anderson's testimony or would have been additional evidence to discredit her identification.  Even then, the remaining evidence against Petitioner was not so slight as to have changed the outcome of the proceeding.

The Court cannot grant habeas relief on this basis.

> **ii.  Counsel was Not Ineffective for Failing to Raise Trial-Counsel's Failure to Object to Anderson's In-Court Identification and Failure to Move to Suppress the In-Court Identification**

Petitioner also asserts that he was denied effective assistance of appellate counsel because counsel failed to raise trial counsel's failure to object to Anderson's in-court identification and failed to move to suppress the in-court identification.  This claim also fails.

As an initial matter, there was no reason for trial counsel to object to Anderson's identification of Petitioner as the second intruder on direct exam, as such identifications are proper. *See, e.g.*, *Stewart v. Greene*, No. 05 Civ. 0566(WHP)(THK), 2009 WL 4030833, at *5 (S.D.N.Y. Nov. 19, 2009) (an in-court identification is not improper, but should be evaluated taking into account the totality of circumstances including defendant's cross examination to determine whether it is improperly suggestive) (adopting report and recommendation); *Kennaugh v. Miller*, 150 F. Supp. 2d 421, 432-34 (E.D.N.Y. 2001) (evaluating the suggestiveness and reliability of an in-court identification to determine the validity of a challenge to the identification's admissibility).

It was not until cross examination by Petitioner's trial counsel that Petitioner and counsel learned of the potential improprieties involved in Anderson's identification, including, that she saw Petitioner's picture numerous times through the media when this case was discussed, that she saw Petitioner's photo on the prosecution's desk during a meeting regarding the case, and that she was shown pictures captured by the apartment's surveillance tape from the night of the incident. (*See* Trial Tr. at 497-99, 590-93).  Upon learning of the circumstances surrounding Anderson's in-court identification, Petitioner's trial counsel moved for a mistrial on the basis that the People failed to serve a proper notice pursuant to CPL § 710.30 and because the identification had been tainted for the reasons previously mentioned.  (*Id.* at 500-02).  The motion was denied by the trial court and appellate counsel raised the violation of CPL § 710.30 notice on appeal.  (*Id.* at 560-61).

Given trial counsel's conduct, Petitioner's claim here must fail.  Trial counsel took proper steps following the cross-examination discoveries in moving for a mistrial and requesting a further hearing into the issue outside the presence of the jury.  (*Id.* at 499-502).  Once the identification problems became apparent, trial counsel acted diligently and professionally in attempting to obtain a mistrial or suppress the identification.  At that point, it is difficult to see what more counsel could have done.  The trial court denied the motion and counsel noted his disagreement, and appellate counsel thereafter raised the issue concerning the § 710.30 notice on direct appeal.

There is no basis to find ineffective assistance at this point by either trial or appellate counsel.

### C.  Whether The Imposition Of Consecutive Sentences Was Illegal (Ground Three)

Petitioner's final claim for habeas relief is that the evidence did not establish that the assaults of the two officers were separate acts, rendering the imposition of consecutive sentences illegal.  However, it is well established that "[w]ether a sentence should run concurrently or

consecutively is purely an issue of state law and is not cognizable on federal habeas review." *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) (citing *Reyes v. New York*, No. 08 Civ 8654, 2009 WL 1066938 at *2 (S.D.N.Y. Apr. 21, 2009)); *see also United States v. McLean*, 287 F.3d 127, 136-37 (2d Cir. 2002) (finding no constitutional right to concurrent, rather than consecutive, sentences); *Heath v. Hoke*, No. CIV-88-770E, 1989 WL 153759, at *3 (W.D.N.Y. Dec. 7, 1989) ("[A] state court's interpretation of state law on concurrent and consecutive sentences is not a question of federal constitutional dimension cognizable in a federal habeas corpus proceeding."); 28 U.S.C.A. § 2254(a) (federal courts can grant habeas relief only when the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States.").

This ends the matter in terms of Petitioner's habeas corpus petition. Matters of sentencing involve state law issues and there is no alleged violation of federal statutory or constitutional law. Whether Petitioner properly received consecutive sentences for being involved in acts relating to the shooting of two separate police officers was a matter of state law for the state trial judge to determine. Petitioner raised this before the Appellate Division in a *pro se* supplemental brief. The Appellate Division noted the sentencing transcript where the court imposed two consecutive 20-year sentences for the two counts of assault in the first degree on the officers. As a matter of state law, the Appellate Division, which could have modified the sentence, found Petitioner's arguments that the sentence was illegal lacked any merit. On this basis alone, Petitioner's claim on this ground should be denied.

## CONCLUSION

For all the reasons stated above, there is no basis to grant the Petition for habeas corpus relief. Therefore, the Amended Petition for a writ of habeas corpus (Dkt. # 4), is DENIED. The

Court also denies issuance of a certificate of appealability because Petitioner has failed to make a

substantial showing of the denial of any constitutional right.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
February 5, 2021.